UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| RONNIE BLACKWELL, ) | |
| ) | |
| Plaintiff ) | |
| ) | |
| vs. ) | Case No. 4:04CV00941 ERW |
| ) | |
| DAIMLERCHRYSLER CORPORATION, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM AND ORDER

This matter comes before the Court upon Defendant DaimlerChrysler's Motion for Summary Judgment on All Claims [doc. #28] and Plaintiff's Motion to Strike Motion for Summary Judgment on All Claims [doc. # 31].

### I. BACKGROUND

Defendant DaimlerChrysler Corporation ("DaimlerChrysler") is an automobile manufacturer with facilities located in Fenton, Missouri. Plaintiff Ronnie Blackwell is an employee at one of the Fenton facilities, working the second shift. He works as an assembler in the Body Shop. Specifically, Plaintiff assembles the "left quarter inner panel" of the DaimlerChrysler minivan. To assemble this subcomponent of the minivan, Plaintiff loads certain parts into a fixture to be welded together. After the parts are welded together, they form a subcomponent that is passed on a conveyor belt to the next part of the assembly process. Specifically, Mr. Blackwell loads a D-post, the wheelhouse, baffles, and skins into machines and then pushes a button to signal a robot to weld the pieces together, forming the completed left quarter inner panel. There is a predefined "cycle time" for loading the parts for each

1

subcomponent. If the process is not completed within this allotted number of seconds of this predefined "cycle time," the particular load will be deemed a "slow load." Pursuant to the employee Standards of Conduct, each employee is required to exert normal effort in the performance of his job. Excessive slow loads may be evidence than an employee is not exerting normal effort in his job.

Laura Bennett was Plaintiff's supervisor for the entire relevant time period except for February 2004 through the end of 2004. Bennett believed that Plaintiff was a "difficult employee on a daily basis." She claimed that Plaintiff "was capable of doing [his job]; however, he did not do it consistently." Plaintiff's prior supervisors had periodically reprimanded or disciplined him for leaving his workstation without permission, failing to put forth normal effort on the job, and excessive unexcused tardiness. Some of those disciplinary actions were later withdrawn.

Prior to July 2003, Plaintiff worked with another employee assembling the left quarter inner panel. In late July 2003, the job description for Plaintiff's position changed. In order to reduce inefficiencies and cut costs in the plant, the left quarter inner assembly job was changed to a one person job, in both the first and second shift. The right quarter inner assembly job was similarly reduced to a one person job. Plaintiff remained at the same assembly position, only now he performed the duties alone. With the change from a two person job to a one person job, Plaintiff's position became more difficult. Bennett was not involved in the decision to change Plaintiff's job description in July 2003.

Following the change to Plaintiff's position, Bennett claims to have immediately noticed an increase in Plaintiff's slow loading of his machines. Bennett learned from the day shift supervisor that the day shift was not experiencing the same slow-loading problems after the left

2

quarter inner assembly job was changed to a one person job.[1]

On August 13, 2003, Ms. Bennett issued a warning to Plaintiff that he failed to exert normal effort in his job on August 12, 2003 resulting in excessive slow loading. Plaintiff alleges that Bennett wanted him to do his job in a different way than it was described in the posted man assignment ("job description"). Specifically, she wanted Plaintiff to pick up two parts at a time instead of one. When Plaintiff continued to follow the written job description, Bennett would discipline him for slow loading. Eventually, Bennett physically removed the written job description from Plaintiff's workstation.[2]

Plaintiff argues that he was not slow loading because the "cycle time" had not changed since the assembly job was changed from a two person job to a one person job. Plaintiff has presented evidence that an employee cannot be issued discipline for working at a normal pace and using the tools provided to him before an elemental break-down has been done and a work standard has been established. Plaintiff argues that the job was significantly more difficult after the job change, since the "cycle time" was not changed. Plaintiff was disciplined for slow loading on August 15 and August 21. On August 26, 2003, the Industrial Engineering Department performed an "elemental breakdown" (attached as Def. Exh. H) of the new position. According to the breakdown, the position is capable of being performed, using normal efforts, within the

---

[1]Plaintiff argues that this evidence is hearsay. The Court finds that this evidence is not hearsay because it is not being offered to prove the truth of the matter; instead, instead, the first shift supervisor's response is being offered to show the reason why Bennett later disciplined Plaintiff. However, the Court notes that it will not consider this testimony as evidence that the first shift worker did not slow load.
    Plaintiff also speculates that more than one person may be working at that position during first shift or that the primary worker in the left quarter inner assembly job may have an assistant. However, Plaintiff has provided no evidence that this is the case.

[2]The Court notes that there is evidence that the job description was eventually changed, requiring the worker to carry two parts at a time.

ordinary hours of Plaintiff's shift.

Twice on August 13, 2003, Bennett told Plaintiff that he was too old for the job and that he should quit or get off the job. On August 15, 2003, Plaintiff received a one-day disciplinary lay-off for failing to put forth normal effort in his job on August 14, 2003. On August 21, 2003, Plaintiff received an additional three-day disciplinary lay-off for failing to put forth normal effort in his job on August 14, 2003 resulting in excessive slow loads. Plaintiff asseverates that when younger workers periodically filled in for Plaintiff at his job, they would also slow load, but were not disciplined by Bennett. For example, on April 28, 2003, when Plaintiff was not at his workstation, the worker doing his job slow loaded 189 times, and he was not reprimanded or disciplined. Defendant claims that these workers justifiably took longer than the allotted "cycle time" to load the machine because, unlike Plaintiff, they were not performing their regular jobs.

On September 5, 2003, Plaintiff became injured and pushed Bennett's call button per company policy; however, Bennett failed to respond. On September 10, 2003, Bennett refused Plaintiff's request for a medical break.

Plaintiff took a leave of absence for approximately one month, returning on October 8, 2003. Again, on October 8, Bennett told Plaintiff that he was too old for his job. On October 9, 2003, Plaintiff filed a grievance alleging age discrimination. Plaintiff alleges that on October 10 and 13, he waited 15 to 30 minutes for Bennett to respond when Plaintiff pressed her call button. Plaintiff filed company grievances through the union on both occasions. On October 11, 2003, Plaintiff filed another grievance alleging discrimination. On October 29, 2003, Plaintiff file a charge of discrimination with the Missouri Commission on Human Rights.

On November 7, 2003, Plaintiff asked Bennett to call his union shop steward, but she failed to do so. On November 26, 2003, Plaintiff pushed Bennett's call button four times. Twenty-five minutes later, Bennet came to Plaintiff's workstation, but did not respond to his

4

request to use the restroom. However, a utility worker was sent to relieve him after he pressed her call button again. On December 3, 2003, Plaintiff told Bennet that he needed to use the restroom, but she did not send a utility worker to relieve him. On December 8, 2003, Plaintiff had to wait for a period of time before being able to use the restroom.

Onika Carmichael works in the Human Resources Department. She told Plaintiff's union representative that so long as Plaintiff continued to file grievances, he would continue to be disciplined. All of the grievances filed on behalf of Plaintiff through the union relating to discrimination by Bennett have been denied by Human Resources.

On December 11, 2003, Plaintiff suffered from a split fingernail. Bennett permitted Plaintiff to leave his workstation and go to the on-site medical facility. After returning from the medical facility, Plaintiff did not immediately return to work. Plaintiff claims that he was unable to return to work because he could not put on his protective kevlar gloves because of the injury to his fingernail, so he sat outside Bennett's cubicle to wait for directions on what he should do. However, it is undisputed that prior to speaking with Bennett, Plaintiff returned to his workstation, replacing the utility worker who had been performing Plaintiff's job in his absence. Upon learning from the utility worker that Plaintiff had not immediately returned to his workstation after returning from the medical facility, Bennett disciplined Plaintiff with a five-day disciplinary lay-off.

On February 2, 2003 Plaintiff was injured on the job, apparently dislocating his shoulder. Bennett failed to respond when Plaintiff pressed her call button. On February 3, 2004, Bennett gave Plaintiff permission to go to the medical facility for his injured shoulder. On this occasion, Plaintiff was seen by Dr. Tim Anderson. Defendant has presented evidence that Dr. Anderson is an independent physician that provides medical services under contract at the plant's medical facility. During this visit, Dr. Anderson informed DaimlerChrysler's HR Generalist Lori Sharp

5

that he believed Plaintiff to be under the influence of drugs or alcohol, and Sharp suspended Plaintiff indefinitely. Plaintiff admits that he did not know Sharp prior to this date. Bennett told Plaintiff's union that she did not think he had been drinking; however, she did not tell human resources. On April 1, 2004, Plaintiff filed a complaint with the Missouri Human Rights Commission for retaliation.

In February 2004, Bennett moved to the first shift, and Supervisor John Templeton replaced her as Plaintiff's supervisor. During the six months that Templeton was Plaintiff's supervisor, he "found Ronnie dependable. He was there on time. He was ready to go to work at the start of the shift, had got all his protective equipment on. I had no problems during my six months." He did not find Plaintiff's calls for medical or restroom to be excessive. Furthermore, he did not have a problem with Plaintiff slow loading. Indeed, he spent most of his time in different areas that were having problems. Furthermore, he believed that Plaintiff's work was "as good or better than anybody that [he] had put in to those positions." However, Templeton did note that "that job was not bid out while [Plaintiff] was there, so it was always either a utility person, a TPT [temporary worker], or a floater" in the job if Plaintiff was not there. Plaintiff did not file any grievances against Templeton while he was Plaintiff's supervisor.

At the beginning of 2005, Bennett returned to working on the second shift. On April 20, 2005, Bennett disciplined Plaintiff with a one-day disciplinary lay-off for violating the normal work effort by slow loading. On May 27, 2005, Plaintiff requested that Bennett call his union shop steward at 6:30 p.m., but she forgot to do so and did not call until 10:57 p.m. On May 31, 2005, Plaintiff waited 30 minutes before a utility worker relieved him so that he could use the restroom. On June 21, 2005 Plaintiff filed a grievance for discrimination, harassment and retaliation.

On July 22, 2004, Plaintiff filed suit alleging (1) age discrimination; (2) retaliation; and

(3) hostile work environment in violation of the Missouri Human Rights Act, § 213.055 et seq. Mo. Rev. Stat. and Title 29 U.S.C. § 622, et seq. Defendant filed a Motion for Summary Judgment on all claims arguing that Plaintiff has not raised a genuine issue of material fact that would justify submitting his claims to a jury.

## II. SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56(c), a court may grant a motion for summary judgment only if all of the information before the court shows "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Crumley v. City of St. Paul, 324 F.3d 1003, 1006 (8th Cir. 2003). The United States Supreme Court has noted that "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the federal rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 1).

"'By its terms, [Rule 56(c)(1)] provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for judgment; the requirement is that there be no *genuine* issue of *material* fact.'" Hufsmith v. Weaver, 817 F.2d 455, 460 n.7 (8th Cir. 1987) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis added by Supreme Court)). Material facts are "those 'that might affect the outcome of the suit governing law.'" Id. (quoting Anderson, 477 U.S. at 247-48). Summary judgment will be denied due to a material issue of genuine fact if "the evidence is sufficient to allow a reasonable jury to return a verdict for the non-moving party." Crumley, 324 F.3d at 1006. Further, if the non-moving party has failed to "make a showing sufficient to establish the existence of an element essential to that party's case, . . . there can be 'no genuine issue as to any material

7

fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 322-23, quoted in St. Jude Med., Inc. v. Lifecare Intern., Inc., 250 F.3d 587, 595 (8th Cir. 2001).

The initial burden of proof in a motion for summary judgment is placed on the moving party to establish the non-existence of any genuine issue of fact that is material to a judgment in its favor. Crumley, 324 F.3d at 1006 (citing Lynn v. Deaconess Med. Ctr.-W. Campus, 160 F.3d 484, 487 (8th Cir. 1998)). The burden then shifts to the non-moving party who must set forth specific evidence showing that there is a genuine dispute as to material issues. Anderson, 477 U.S. at 249. To meet its burden, the non-moving party may not rest on the pleadings alone and must "do more than simply show there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586.

In analyzing summary judgment motions, the court must view the evidence in the light most favorable to the non-moving party. Crumley, 324 F.3d at 1008. The non-moving party is given the benefit of any inferences that can logically be drawn from those facts. Matsushita, 475 U.S. at 586. The court may not "weigh the evidence in the summary judgment record, decide credibility questions, or determine the truth of any factual issue." Kampouris v. St. Louis Symphony Soc., 210 F.3d 845, 847 (8th Cir. 2000). The court instead "perform[s] only a gatekeeper function of determining whether there is evidence in the summary judgment record generating a genuine issue of material fact for trial on each essential element of a claim." Id.

**III. DISCUSSION[3]**

---

[3]The Court will only analyze Plaintiff's federal claims because the same analysis applies to Plaintiff's MHRA claims. See, Johnson v. AT & T Corp., 422 F.3d 756, 764 (8th Cir. 2005); David v. Hammonds, 103 Fed.Appx. 51, 53 (8th Cir. 2004); Duncan v. Gen. Motors Corp., 300 F.3d 928, 930 n. 2 (8th Cir.2002); Gagnon v. Sprint Corp., 284 F.3d 839, 848 (8th Cir. 2002), overruled on other

As a preliminary matter, the Court will address Defendant's contention that Plaintiff is attempting to create disputed facts by introducing sham affidavits in support of his Response to Defendant's Motion for Summary Judgment. Citing Schiernbeck v. Davis, 143 F.3d 434, 438 (8th Cir. 1998), Defendant argues that new testimony raised in affidavits in opposition to a motion for summary judgment is inadmissible, even if the new testimony is not directly at odds with prior deposition testimony. This Court finds than the "sham affidavit rule" will *only* apply if the affidavit is "plainly inconsistent" with prior testimony. See Schiernbeck, 143 F.3d at 438 (affidavit was plainly inconsistent with prior deposition testimony); American Airlines, Inc. v. KLM Royal Dutch Airlines, Inc., 114 F.3d 108, 111 (8th Cir. 1997) (sham affidavit if submit affidavit contradicting his own earlier testimony); and Camfield Tires, Inc. v. Michelin Tire Corp., 719 F.2d 1361, 1365-66 (8th Cir. 1983) (summary judgment appropriate if party files an affidavit in an attempt to abandon prior testimony given under oath). In Fast v. Southern Union Co., Inc., the 8th Circuit reversed a grant of summary judgment, noting that "[o]nly in circumstances. . . where the conflicts between the deposition and affidavit raise. . . sham issues should summary judgment be granted." 149 F.3d 885, 892 n.7 (8th Cir. 1998). That court found that the plaintiff's affidavit did not contradict his former deposition testimony; instead, the affidavit supplemented his deposition by "com[ing] forward with additional proof that age was a factor in [defendant's] decision to terminate him." Id. In this case, like Fast, Plaintiff's affidavit supplemented his prior deposition testimony with additional instances of alleged discrimination. Thus, the Court will consider the additional facts proffered by Plaintiff.

**A. Age Discrimination**

---

grounds; Mole v. Buckhorn Rubber Products, Inc., 165 F.3d 1212, 1216 (8th Cir. 1999), cert. denied, 528 U.S. 821 (1999).

9

The ADEA makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C.. § 623(a)(1). A Plaintiff can prove disparate treatment discrimination through direct or indirect evidence. Rivers-Frison v. Southeast Missouri Community Treatment Ctr., 133 F.3d 616, 618-19 (8th Cir. 1998).

    1. Direct Evidence Paradigm

Under the Direct Evidence Paradigm, a "plaintiff must present evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude sufficient to permit the fact-finder to infer that the attitude was more likely than not a motivating factor in the employer's decision." Id. at 619 (internal citations omitted). "Thus, 'direct' refers to the causal strength of the proof, not whether it is 'circumstantial' evidence." Griffith v. City of Des Moines, 387 F.3d 733, 736 (8th Cir. 2004). Courts have pointed to the distinction between those "[c]omments which demonstrate a discriminatory animus in the decisional process or those uttered by individuals closely involved in employment decisions, from stray remarks in the workplace, statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process." Rivers-Frison, 133 F.3d at 619 (internal citations omitted); see also Radabaugh v. Zip Feed Mills, Inc., 997 F.2d 444 (8th Cir. 1993) (reasonable factfinder could find that corporate planning documents citing that strength of company was having young, well educated and results oriented managers exhibited a discriminatory animus that was a motivating factor in decisionmaking process to terminate plaintiff). "A defendant is not entitled to summary judgment if the plaintiff has sufficient evidence that unlawful discrimination was a motivating factor in the defendant's action even if the defendant has brought forward evidence of additional legitimate motives." Peterson v. Scott County, 406 F.3d 515, 521 (8th Cir. 2005).

10

This Court holds that Plaintiff presented sufficient evidence to allow a reasonable factfinder to find that a discriminatory animus was a motivating factor in the decisionmaking process that led Bennett to repeatedly reprimand and discipline Blackwell. In this case, Defendant does not dispute that Plaintiff's supervisor, Bennett, told Plaintiff that he was too old for the job and he should quit. Bennett, as Plaintiff's supervisor, was clearly involved in making employment decisions regarding Plaintiff. See Weyers v. Lear Operations Corp., 359 F.3d 1049, 1057 (8th Cir. 2004).

Defendant argues that Bennett's statements were made because Plaintiff was not being a productive employee. Defendant's arguments rely on the rationale set forth in cases such as Barket v. Nextira One, 72 Fed. Appx. 508, 510-11 (8th Cir. 2003), Montgomery v. John Deere & Co., 169 F.3d 556, 560 (8th Cir. 1999), Zieler v. Beverly Enters. - Minn., Inc., 133 F.3d 671, 676 (8th Cir. 1998) and Thomure v. Phillips Furniture Co., 30 F.3d 1020, 1025 (8th Cir. 1994). In those cases, the court held there was no discriminatory animus in the decision process when superiors suggested retirement for employees who had reached retirement age and were no longer able to perform to the company's expectations. After reviewing the record in this case, the Court finds that the circumstances in this case are quite different than in those cases. Bennett's statements were not friendly suggestions like those made in the other cases. Instead, there is additional evidence of mistreatment, such as repeatedly failing to respond to her call button when Plaintiff needed to use the restroom or go to the medical facility, that suggests discriminatory animus. See Carter v. Chrysler Corp., 173 F.3d 693, 701 (8th Cir. 1999) and Bowen v. Mo. Dep't of Soc. Servs., 311 F.3d 878, 884 (8th Cir. 2002). Furthermore, there is evidence that Plaintiff was able to "keep up" with the requirements of his job. For the period of time that Bennett was working on first shift, Plaintiff was never reprimanded or disciplined for slow loading. In fact, the supervisor at the time indicated that Plaintiff was as good or better than the

temporary workers that filled in for him when he was not at his workstation.[4]  Then, when Bennett returned to working the second shift, it was only a short time before Plaintiff was again disciplined for failing to exert normal effort.  Thus, this Court finds that there is direct evidence of a discriminatory animus in the decisional process relating to Plaintiff by someone involved in employment decisions.

      2. Indirect Evidence Paradigm

"In the absence of direct evidence, the plaintiff may survive summary judgment with evidence that the adverse employment action occurred under circumstances giving rise to an inference of unlawful discrimination."  Simpson v. Des Moines Water Works, 425 F.3d 538, 542-43 (8th Cir. 2005). Here, because the Court has found direct evidence of a discriminatory animus, analysis under the indirect evidence paradigm is unnecessary.

**B. Hostile Work Environment**

In order to present a prima facie claim of hostile work environment, the Plaintiff must establish that "(1) he belongs to a protected group; (2) he was subject to unwelcome harassment; (3) a casual nexus exists between the harassment and the protected group status; (4) the harassment affected a term, condition, or privilege of employment; and (5) his employer knew or should have known of the harassment and failed to take proper action."  Sallis, 408 F.3d at 476.  The harassment must both objectively and subjectively affect a term, condition, or privilege of employment.  Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998); Baker, 382 F.3d at 828.

---

[4]Defendant argues that the productivity of the temporary workers cannot be compared with Plaintiff's productivity since the temporary workers were not working in their normal job.  However, neither party has presented any evidence regarding how long it would take to learn to perform Plaintiff's job.  The description of Plaintiff's job presented to the Court in the parties' briefing suggests that although the job was physically difficult, it would not take a significant period of time for a worker to learn how to load the parts.

"A plaintiff may prevail in a discrimination claim by showing the inappropriate conduct creates a 'hostile work environment.'" Baker v. John Morrell & Co., 382 F.3d 816, 828 (8th Cir. 2004). Courts consider the totality of the circumstances when determining if the harassment is objectively offensive. See Breeding v. Arthur J. Gallagher & Co., 164 F.3d 1151, 1158 (8th Cir.1999) ("Harassment based on an individual's ... age, in violation of the ADEA, is actionable when that harassment is so severe or pervasive as to alter the conditions of the victim's employment and create an abusive working environment. To be actionable, harassment must be both objectively and subjectively offensive ...."); Baker, 382 F.3d at 828; and Oncale v. Sundowner Offshore Serv., Inc., 523 U.S. 75, 81 (1998).

Plaintiff belongs in a protected group. "The ADEA forbids an employer from discriminating against an employee at or above the protected age of forty years because of the employee's age." Stidham v. Minnesota Min. and Mfg., Inc., 399 F.3d 935, 938 (8th Cir. 2005) (citing 29 U.S.C. §§ 623(a)(1), 631(a)). In this case, Plaintiff is in a protected group because he is 53 years old.

A reasonable factfinder could find that Plaintiff was subjected to repeated harassment by Bennett. Plaintiff has presented evidence that subjectively believed Bennett's actions to be hostile. He alleges that his leave of absence in September and October of 2003 was due to work-related stress. Furthermore, he repeatedly asked the union to file grievances on his behalf, and he filed additional claims with the Missouri Human Rights Commission. There is also objective evidence that the atmosphere was hostile. Not only did she repeatedly make remarks that he was too old and should quit his job, she allegedly: (1) repeatedly disciplined him for failing to exert normal effort when he refused to do his job in a different way than as it was posted in his job description; (2) refused or delayed Plaintiff's requests for medical break; (3) repeatedly failed to respond in a reasonable time to her call button; (4) refused or delayed restroom breaks; and (5)

13

failed to inform human resources that she did not believe Plaintiff was under the influence of alcohol or drugs. "To be actionable, such conduct must be shown to occur with such frequency that the very conditions of employment are altered and be viewed by a reasonable person as hostile." Singletary v. Missouri Dept. of Corrections, 423 F.3d 886, 893 (8th Cir. 2005). This Court finds that Plaintiff has presented sufficient evidence to a genuine issue of fact relating to whether Bennett's behavior created a hostile environment.

Furthermore, there is direct evidence of a nexus between Bennett's behavior and Plaintiff's age. As discussed above, Bennett made explicit derogatory references to his age on three different occasions, telling him he was too old for the job. Furthermore, "[a]ll instances of harassment need not be stamped with signs of overt discrimination to be relevant under Title VII if they are part of a course of conduct which is tied to evidence of discriminatory animus." Carter, 173 F.3d at 701 (8th Cir. 1999); see also Bowen v. Mo. Dep't of Soc. Servs., 311 F.3d 878, 884 (8th Cir.2002) (concluding that because alleged harasser's two "white bitch" epithets "carried clear racial overtones, they permit[ted] an inference that racial animus motivated not only [the supervisor's] overtly discriminatory conduct but all of her offensive conduct towards [the plaintiff]").

Finally, there is evidence that the harassment affected his employment and Defendant knew about the harassment and failed to take proper action. Plaintiff has proffered evidence that Bennett's actions affected his employment. He was reprimanded multiple times, a few times resulting in disciplinary lay-offs. Less importantly, but still relevant, trips to the medical facility and restroom were often delayed and periodically refused or ignored. Finally, Plaintiff has presented evidence that he filed grievances related to the harassment with human resources. Not only did his grievances get denied, he was threatened with further discipline if he continued to file grievance claims about Bennett's conduct. Thus, this Court finds that a reasonable factfinder

could find that Plaintiff was subjected to a hostile work environment.

### C. Retaliation

To establish a prima facie case of retaliatory discrimination under Title VII, a plaintiff must show (1) he engaged in statutorily protected activity; (2) an adverse employment action was taken against him; and (3) a causal connection exists between the two events. See, e.g., Baker, 382 F.3d at 829; Manning v. Metro. Life Ins. Co., Inc., 127 F.3d 686, 692 (8th Cir. 1997). The plaintiff may submit circumstantial evidence of retaliation by demonstrating that "the discharge followed the protected activity so closely in time as to justify an inference of retaliatory motive." Rath v. Selection Research, Inc., 978 F.2d 1087, 1090 (8th Cir. 1992). However, there must be "more than a temporal connection between an employee's protected conduct and the adverse employment action [] to create a genuine factual issue on causation." Hesse, 394 F.3d at 633; Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1136 (8th Cir. 1999).

Plaintiff has presented evidence that Onika Carmichael in human resources told Plaintiff's union representative that Plaintiff would continue to be disciplined so long as he continued to file grievances regarding discrimination. Defendant argues that this statement is immaterial to Plaintiff's retaliation claim. On the contrary, the Court finds this statement to be indicative of the treatment Plaintiff received after filing grievances alleging discrimination. Not only did human resources ignore Plaintiff's complaints by denying each grievance, human resources personnel threatened Plaintiff with additional discipline. This Court finds that evidence presented by Plaintiff is sufficient for a reasonable factfinder to find that Defendant retaliated against Plaintiff.

Accordingly,

**IT IS HEREBY ORDERED** that the Motion for Summary Judgment [doc. #28] is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Strike Motion for Summary Judgment on All Claims [doc. # 31] is **DENIED as MOOT**.

Dated this 10th day of November, 2005.

_____
E. RICHARD WEBBER
UNITED STATES DISTRICT JUDGE